John J. Grogan
NJ I.D. No. 026971993
LANGER, GROGAN & DIVER
1717 Arch St., Ste 4020
Philadelphia, PA 19103
Tel: (215) 320-5660
Fax: (215) 320-5703
jgrogan@langergrogan.com                              Attorney for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| MARY HAREMZA and JACOB MURRAY, *in his capacity as the executor of the estate of Stacy Murray, on behalf of themselves and all others similarly situated,* | Civil Action No. _____ |
| Plaintiffs, | |
| v. | |
| JOHN DOES Nos. 1-15, AANIIIH NAKODA FINANCE, LLC, d/b/a BRIGHT LENDING, TERRY BROCKIE, DUSTIN MONROE, TRACY KING, KENNETH HELGESON, CHRIS GARDIPEE, ROMONA HORN and JOHN HAWLEY, | CLASS ACTION |
| Defendants. | |

## CLASS ACTION COMPLAINT

Plaintiffs, Mary Haremza and Jacob Murray, *in his capacity as executor of the estate of Stacy Murray*, *on behalf of themselves and all others similarly situated,* file this Class Action Complaint against John Does Nos. 1-15 and the named Defendants. In support of their Complaint, Plaintiffs allege as follows:

**INTRODUCTION**

1.      Plaintiffs are New Jersey consumers who received illegal, high-interest loans over the internet, supposedly made by an online lending company named Aaniiih Nakoda Finance, LLC d/b/a Bright Lending ("Bright Lending"), which holds itself out as a company owned and operated by a Native American tribe. Both of the loans at issue in this case charged Plaintiffs an Annual Percentage Rate of 699.9%, requiring Plaintiffs to repay more than $2,500 in finance charges in less than six weeks on loans that were $550 or less.

2.      Usury—the practice of lending money at unreasonably high rates of interest— "is an ancient crime by which the powerful exploit the most poor and desperate." *Dunn v. Glob. Tr. Mgmt., LLC*, 2020 WL 7260771 (M.D. Fla. Dec. 10, 2020). And "[a]s ancient as the practice of usury and loansharking may be, equally old are circumvention schemes to avoid its prohibition." *Id*. This case involves one of those schemes, which is commonly referred to as a "tribal lending" business model, or more colloquially, as "rent-a-tribe," a "recent incarnation of payday lending companies regulation-avoidance." Nathalie Martin & Joshua Schwartz, *The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?*, 69 Wash. & Lee L. Rev. 751, 785 (2012).

3.      Non-tribal payday lenders and third-party funders wishing to use this model to circumvent state legal prohibitions go searching for a small, easily dominated, tribe that will be willing to serve as the consumer-facing façade for the usury scheme, in return for receiving a small portion of the revenue generated (the "rent" referred to in the "rent-a-tribe" label) and, often, some call-center jobs. The tribal entity playing this role serves as the nominal lender for the purpose of enabling the non-tribal actors running the operation to make the dubious and legally incorrect claims that (a) the loans are subject only to tribal law, not the protections created by state usury

and licensing laws, and (b) that they themselves are somehow vicariously protected by the tribe's sovereign immunity.

4.     Federal law does not grant Native American tribes any special power to make loans over the internet to consumers across the United States in violation of state usury restrictions. On the contrary, it is well settled that "[a]bsent a federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to non-discriminatory state law otherwise applicable to all citizens of the State." *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148–49 (1973). Nonetheless, the tribal employees named as Defendants have deliberately chosen to enter and facilitate the loansharking enterprise described below.

5.     Defendants have actively participated in the scheme and have conspired with each other and others to repeatedly violate state lending statutes resulting in the collection of unlawful debt from Plaintiffs and the members of the class described below.

6.     Defendants and others not yet known to Plaintiffs have been knowingly participating in the illegal lending enterprise, which has made and is making and has collected and is collecting on grossly usurious loans. This lawsuit challenges the legality of Bright Lending's high interest loans and seeks damages and declaratory relief against co-conspirators participating in this illegal scheme, including, most importantly, those whose identities have been deliberately concealed. More specifically, Plaintiffs seek relief under the Racketeer Influenced and Corrupt Organizations Act ("RICO"); New Jersey's usury laws; New Jersey's Consumer Finance Licensing Act; and New Jersey's Consumer Fraud Act. Bright Lending and others have likely collected tens of millions of dollars on void loans and in violation of state usury, licensing, and criminal statutes.

## JURISDICTION

7.      This Court has subject matter jurisdiction pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1332(d)(2). Moreover, the Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

8.      Venue is proper in this Court pursuant to 18 U.S.C. § 1965(a) because Defendants have transacted their affairs in New Jersey, including the making and collection of loans to likely thousands of borrowers in New Jersey. Additionally, venue is also proper in this Court pursuant to 28 U.S.C. § 1965(b) because Plaintiffs are residents of this Division and a substantial part of Plaintiffs' claims occurred in New Jersey.

## PARTIES

9.      Plaintiff Mary Haremza is a natural person residing in South Amboy, New Jersey.

10.      Plaintiff Jacob Murray is a natural person residing in South Amboy, New Jersey. He is suing in his capacity as executor of the estate of Stacy Murray, his late wife who was a natural person residing in South Amboy, New Jersey. She will be referred to as "Mrs. Murray."

11.      John Doe Defendants Nos. 1-15 are the as-yet unknown individuals and business organizations that designed, are operating, and have extracted most of the revenue from the Bright Lending enterprise. Their identity, which has been hidden as a key part of the underlying scheme, will be easily established in this litigation.

12.      Aaniiih Nakoda Finance, LLC d/b/a Bright Lending holds itself out as an entity formed under the laws of the Fort Belknap Indian Community of the Fort Belknap Reservation of Montana. (This Native American community is hereafter referred to as "the Tribe.") The Tribe has also engaged in the activities alleged herein through its limited liability company, Island Mountain Development Group.

4

13.     Defendant Terry Brockie is a resident of Montana and is the Chief Executive Officer of Island Mountain Development Group. Plaintiffs seek only monetary damages from Terry Brockie in his individual capacity for his violations of state and federal law.

14.     Defendant Dustin Monroe is a resident of Montana and is the Director of Lending Operations at Island Mountain Development Group. Plaintiffs seek only monetary damages from Dustin Monroe in his individual capacity for his violations of state and federal law.

15.     Defendant Tracy King is a resident of Montana and is the Chairman of the Island Mountain Development Group Board of Directors. Plaintiffs seek only monetary damages from Tracy King in his individual capacity for his violations of state and federal law.

16.     Defendant Kenneth Helgeson is a resident of Montana and the Vice-Chairman of the Island Mountain Development Group Board of Directors. Plaintiffs seek only monetary damages from Kenneth Helgeson in his individual capacity for his violations of state and federal law.

17.     Defendant Chris Gardipee is a resident of Montana and is the Secretary and Treasurer of the Island Mountain Development Group Board of Directors. Plaintiffs seek only monetary damages from Chris Gardipee in his individual capacity for his violations of state and federal law.

18.     Defendant Romona Horn is a resident of Montana and is a Board Member of the Island Mountain Development Group Board of Directors. Plaintiffs seek only monetary damages from Romona Horn in her individual capacity for her violations of state and federal law.

19.     Defendant John Hawley is a resident of Montana and is a Board Member of the Island Mountain Development Group Board of Directors. Plaintiffs seek only monetary damages from John Hawley in his individual capacity for his violations of state and federal law.

## FACTUAL ALLEGATIONS

**A. The loans at issue violated New Jersey licensing and usury laws.**

20.     Usury laws prohibit lenders from charging borrowers excessively high rates of interest on loans. These laws have ancient origins, as usury prohibitions have been part of every major religious tradition. As Pope Francis has recently put it, "Usury humiliates and kills. Usury is a grave sin. It kills life, stomps on human dignity, promotes corruption, and sets up obstacles to the common good."[1]

21.     In the United States, every colony adopted a usury statute based on the English model.[2] *See Payday Today, Inc. v. Defreeuw*, 903 N.E.2d 1057, 1060 (Ind. Ct. App. 2009) (noting that "[u]sury legislation to cap interest rates on loans predates the founding of our country" and citing Peterson, *supra* at n. 2, 92 Minn. L. Rev. at 1116 n.13). In addition to general usury laws, most states have adopted small-loan statutes that allow specifically defined, small-amount loans at higher rates, conditioned on the lender obtaining a license and complying with the restrictions contained in the statute.

22.     New Jersey has a clearly delineated public policy against usurious, unregulated lending, as reflected by a statutory prohibition against charging consumers an annual interest rate exceeding 16% without first obtaining a consumer lender license. *See* N.J. Stat. § 17:11C-3 (requiring license); N.J. Stat. § 31:1-1(a) (providing an annual interest rate cap of 16% for loan contracts); *see also* N.J. Stat. § 2C:21-19 (providing that it is a criminal offense to charge more

---

[1]  *See* Pope Francis: "Usury humiliates and kills," Vatican News (Feb. 3, 2018), https://www.vaticannews.va/en/pope/news/2018-02/pope-francis-usury-financial-exploitation.html.
[2] *See* Christopher L. Peterson, *Usury Law, Payday Loans, and Statutory Sleight of Hand: Salience Distortion in American Credit Pricing Limits*, 92 Minn. L. Rev. 1110, 1117 (2008).

than the maximum rate permitted by law and that any loan with an interest rate exceeding 30% shall not be a rate authorized or permitted by any law).

23.     Notwithstanding this statutory regime, the Plaintiffs were encumbered with unlicensed loans with interest rates grossly exceeding New Jersey's 16% rate cap that were originated by the usury scheme alleged herein.

24.     On or about November 23, 2020, while in New Jersey, Plaintiff Haremza applied for a $500 loan, via the internet, from a lender named "Bright Lending." After entering her personal information on the website, including her Social Security number and bank account information, she was approved for the loan nearly instantaneously.

25.     The loan agreement generated from the information she entered provided for a repayment sum of more than $3,000, payable in weekly payments of $72.84, representing an Annual Percentage Rate of 699.96%. A copy of the loan agreement is attached as Exhibit A.

26.     According to this form loan agreement, Bright Lending is a "sovereign enterprise that is an economic development arm of, and wholly-owned and controlled by the Fort Belknap Indian Community (the "Tribe"), a federally-recognized sovereign American Indian Tribe."

27.     The agreement further provides that "The laws of the Tribe will govern this Agreement, without regard to the conflict of laws rules of any state or other jurisdiction. You agree to be bound by Tribal law, and in the event of a bona fide dispute between you and us, Tribal law shall exclusively apply to that dispute."

28.     The $500 proceeds of the loan to Plaintiff Haremza were deposited electronically in her bank account, and soon thereafter, the weekly payments were electronically debited from her account. Over time, until she revoked her authorization for these automatic payments, she paid back more than the $500 she borrowed.

29.     On the same day, November 23, 2020, Mrs. Murray also applied for a "Bright Lending" loan from her home computer. She borrowed $550, payable in 21 bi-weekly payments of $157.67, representing an Annual Interest Rate of 699.99%. A copy of the Murray loan agreement is attached as Exhibit B. It contains the same form language regarding the identity of "Bright Lending" and the law supposedly governing the loan.

30.     Over time, payments totaling more than $2,100 were automatically debited from Ms. Murray's bank account.

31.     The Haremza and Murray loans violated New Jersey law in two fundamental respects: (1) the loans were made without a license required by N.J. Stat. § 17:11C-3; and (2) the loans included interest rates that grossly exceeded the 16% rate cap in N.J. Stat. § 31:1-1(a).

32.     The making of and collecting on Ms. Haremza's and Ms. Murray's loans also constituted criminal usury in the second degree. N.J. Stat. § 2C:21-19.

33.     Because the loans were made in violation of the applicable licensing requirements, Plaintiffs' loans are void, and Plaintiffs were never obligated to pay any amount on the invalid loans. *See* N.J. Stat. § 17:11C-33 (providing that loans made without a license or in violation of the licensing statute's interest rate cap "shall be void and the lender shall have no right to collect or receive any principal, interest or charges").

34.     Further, New Jersey law entitles consumers to recover "three times any amount of the interest, costs or other charges collected in excess of that authorized by law" from a consumer lender who "knowingly and willfully" violates its licensing statute. N.J. Stat. § 17:11C-33.

35.     Plaintiff Haremza continues to receive Bright Lending text messages on her cell phone, inviting her to take out another loan.

**B.**     **Bright Lending loans are being made throughout the United States, in violation of laws similar to those in New Jersey**

36.     As in New Jersey, most other states and the District of Columbia recognize a similar

public policy against usury and have adopted similar laws addressing high-interest loans.[3] These

---

[3] Those states include Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Virginia, Washington, West Virginia, Wisconsin, and Wyoming. See Ala. Code § 5-18-4 (loans made without a license "shall be void"); Alaska Stat. § 06.20.310; Ariz. Rev. Stat. § 6-613(B) (loans that charge illegal finance charges are "voidable"); Ark. Code §§ 4-57-104, 105; Cal. Fin. Code §§ 22303, 22750; Colo. Rev. Stat. Ann. § 5-2-201; Conn. Gen. Stat. § 36a-558 (c)(1) (loans made without a license are "void" and uncollectable); Conn. Gen. Stat. § 36a-558 (c)(1) (loans made without a license are "void" and uncollectable); D.C. Code §§ 26-905, 28-3303; Fla. Stat. § 516.02 (loans made with excessive interest rates are "not enforceable"); Ga. Code § 16-17-3 (loans made without a license "shall be void ab initio"); Haw. Rev. Stat. § 478-4; Idaho Code § 28-46-402 (payday loans made without a license are "void, uncollectable and unenforceable"); 815 Ill. Comp. Stat. 122/4-10 (payday loans made without a license "shall be null and void"); Ind. Code Ann. § 24-4.5-5-202 (loans made without the proper authority are "void and the debtor is not obligated to pay either the principal or loan finance charge"); Kan. Stat. § 16a-5-201; Ky. Rev. Stat. Ann. § 286.4-991 (loans made without a license are void); La. Stat. Ann. § 9:3552; Me. Rev. Stat. tit. 9-A, § 2-401; Mass. Gen. Laws Ann. ch. 140, § 110 (small loans made without a license are void);  Md. Code, Com. Law § 12-314 (small loans made without a license that charge excessive interest rates are "unenforceable"); Mich. Comp. Laws §§ 438.32, 445.1854; Minn. Stat. §§ 47.60, 47.601 (provisions in loan contracts charging excessive interest rates are void and unenforceable); Minn. Stat. Ann. § 56.19 (authorizing debtor to recover all amounts paid on loans made in violation of licensing requirements); Miss. Code. § 75-67-119; Mont. Code § 31-1-712 (Any deferred deposit loan made by an unlicensed lender "is void, and the unlicensed person may not directly or indirectly collect, receive, or retain any loan principal, interest, fees, or other charges related to the loan"); Neb. Rev. Stat. § 45-1024; N.H. Rev. Stat. Ann. § 399-A:23 (any contract for small loan by unlicensed lender is "null and void"); N.M. Stat. Ann. § 58-15-3 (small loans made without a license are void); N.Y. Gen. Oblig. Law § 5-511 (usurious loans are "void"); N.Y. Banking Law § 355; N.C. Gen. Stat. Ann. § 53-166 (small loans made without a license are void); N.D. Cent. Code § 13-04.1-09.3 (West); Ohio Rev. Code Ann. § 1321.02 (small loans made without a license are void); Okla. Stat. tit. 14A, § 3-201; Or. Rev. Stat. § 725.045 (consumer finance loans made without a license are "void"); 41 P.S. §§ 501-502; 6 R.I. Gen. Laws Ann. § 6-26-4 (loans charging excessive interest "shall be usurious and void"); S.C. Code § 34-29-140; S.D. Codified Laws § 54-4-44 (loans charging excessive interest or made without a license are "void and uncollectible"); Tenn. Code § 47-14-110, 117; Tx. Fin. §§ 302.001-004; Vt. Stat. tit. 9, § 50; Va. Code § 6.2-1541(any loan made in violation of Virginia's usury and licensing laws "shall be void" and "any principal or interest paid on the loan shall be recoverable by the person by or for

laws are vital public policy tools that state legislatures use to protect consumers in their states from the predatory conduct of high-APR small-loan lenders.

37.    Despite the nearly universal prohibition against unlicensed, high-rate, small-loan lending, Bright Lending loans have been and continue to be made throughout the United States. Upon information and belief, tens of thousands of consumers have become indebted to "Bright Lending," on terms similar to Plaintiffs Haremza and Murray.

**C.    Bright Lending loans are examples of a "tribal" form of payday lending schemes, used by criminals to evade state and federal consumer protections.**

38.    Despite the multitude of state and federal protections to prevent usurious lending, the profits to be realized by making small, high interest loans are so high that some dishonest actors—aided by lawyers willing to help them create complex lending structures that conceal their involvement—are willing to accept the significant risk of litigation and liability for engaging in this criminal activity.

39.    Over the years, payday lenders have used various schemes to evade applicable state and federal protections. In one of these schemes, known colloquially as a "rent-a-bank" strategy, payday lenders would try to exploit banks' unique, federally-granted power to make loans in excess of state usury rates. Under arrangements made with a willing bank, the payday lender would market, fund and collect loans nominally made by a bank that, for its part, earned fees without assuming much, if any, financial risk for the lending.

40.    Because banks are insulated from state examination and regulation by virtue of federal bank pre-emption doctrines, many payday lenders were, for a period of time, able to operate

---

whom payment was made"); Wash. Rev. Code § 19.52.020; W. Va. Code §§ 46A-5-101; Wis. Stat. § 138.14; Wyo. Stat. § 40-14-521.

openly from storefronts, using these "rent-a-bank" arrangements to evade enforcement in states where, like New Jersey, payday lending is illegal. However, beginning in 2005, the Federal Deposit and Insurance Corporation (hereinafter "FDIC") began to limit its regulated banks with regard to such "rent-a-bank" arrangements with payday lenders. *See* FDIC, Guidelines for Payday Lending, FIL-14-2005; *also see* Michael A. Stegman, *Payday Lending*, 21 *Journal of Economic Perspectives* 169, 178-79 (2007) (describing rent-a-bank scheme and regulatory reaction).

41.     As this and other regulatory pressure began to reduce the prevalence of rent-a-bank evasions,[4] the shadow payday loan industry turned to Native American tribes to replace the banks as the nominal lender behind their schemes, trying to take advantage of tribal insulation from state regulatory powers. Under this new "rent-a-tribe" model, the leadership of some economically impoverished tribes would agree to play a figurehead, nominal lender, role and accept the revenue and call-center jobs offered. In return, they would also agree to conceal the identity of the non-tribal actors who would operate the enterprise and extract most of the profits, by participating in a ruse that disguises the business as one managed by and for the sole benefit of the tribe.[5]

42.     To further advance the pretense of tribal initiative and control, and to protect the non-tribal principals from liability for their illegal conduct, various strategies are typically

---

[4] The United States Department of Justice also began cracking down on "rent-a-bank" schemes through an initiative that targeted financial intermediaries such as banks that rented their names to payday lending schemes and other financial scams. *See* Jessica Silver-Greenberg, Justice Department Inquiry Takes Aim at Banks' Business With Payday Lenders, N.Y. TIMES (Jan. 26, 2014).

[5] The use by payday lenders of tribal veneers as an artifice to evade state law has been widely publicized. *See, e.g.*, H.R., Committee on Financial Services, Dem. Staff Report, "Skirting the Law: Five Tactics Payday Lenders Use to Evade State Consumer Protection Law," June 16, 2016, at 15 ("Renting Sovereign Immunity"); Carter Dougherty, "Payday Lenders and Indians Evading Laws Draw Scrutiny," Bloomberg, June 5, 2012; Jeff Guo, "Many States Have Cracked Down on Payday Loans. Here's How Lenders Still Get Away with It," Washington Post, February 9, 2015.

employed to keep the focus on the tribes and deter consumers from enforcing their rights. Such measures include the adoption of tribal codes and regulations, and sometimes a tribal dispute resolution procedure, used to create the pretense of a legal infrastructure independent from state and federal law.

43.     Another central feature of the tribal business model is found in the consumer loan agreements consumers are required to execute as a condition of receiving the illegal, usurious loans. The loan agreements are typically structured to include a waiver of all state and federal rights, in favor of tribal law and dispute resolution provisions. That way, the non-tribal principals running the scheme can claim that they have no liability for their violations of state and federal laws because the loan agreements waive the application of all such law.

44.     The strict enforcement of such agreements would often lead to absurd results, including the waiver of all state and federal rights and the inability of consumers to pursue any redress for the predatory lender's illegal conduct. Not surprisingly, these waivers have been repeatedly invalidated by courts across the country.[6]

45.     During the last decade, federal and state law enforcement agencies have taken various actions to combat tribal lending schemes, including by example:

---

[6] *See Hengle v. Treppa*, No. 20-1062 (4th Cir. Nov. 16, 2021); *Gibbs v. Stinson*, No. 3:18CV676, 2019 WL 4752792, at *14-18 (E.D. Va. Sept. 30, 2019); *see also Gingras v. Think Finance*, 922 F.3d. 112 (2d Cir. 2019); *Brice v. 7HBF No. 2, Ltd.*, No. 19-CV-01481-WHO, 2019 WL 5684529 (N.D. Cal. Nov. 1, 2019); *Brice v. Plain Green*, 372 F. Supp. 3d 955 (N.D. Cal. 2019); *Consumer Fin. Prot. Bureau v. CashCall, Inc.*, No. CV 15-7522-JFW, 2016 WL 4820635, at *7 (C.D. Cal. Aug. 31, 2016); *W. Sky Fin., LLC v. State ex rel. Olens*, 300 Ga. 340, 348 (2016), *reconsideration denied* (Dec. 8, 2016); *Inetianbor v. CashCall, Inc.*, No. 13-60066-CIV, 2015 WL 11438192, at *3 (S.D. Fla. Dec. 8, 2015); *Cooper v. W. Sky Fin., LLC*, No. 13 CVS 16487, 2015 WL 5091229, at *10 (N.C. Super. Aug. 27, 2015); *MacDonald v. CashCall, Inc.*, No. CV 16-2781, 2017 WL 1536427, at *10 (D.N.J. Apr. 28, 2017), *aff'd*, 883 F.3d 220 (3d Cir. 2018); *Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 330, 336 (4th Cir. 2017); *Hayes v. Delbert Services Corp.*, 811 F.3d 666, 675 (4th Cir. 2016); *Rideout v. CashCall, Inc.*, No. 2:16–cv–02817–RFB–VCF, 2018 WL 1220565, at *8 (D. Nev. Mar. 8, 2018).

a. In 2017, the Justice Department obtained highly publicized criminal convictions under RICO against payday loan kingpins and their attorneys, who had used "rent-a-tribe" arrangements to attempt to evade state usury law. *See United States v. Tucker*, No. 1:16-cr-00091-PKC (S.D.N.Y) (October, 2017 conviction of Scott Tucker and his attorney, Timothy Muir, on all fourteen felony counts brought against them);[7] *United States v. Hallinan*, No. 2:16-cr-00130-ER (E.D. Pa.) (November, 2017 conviction of Charles M. Hallinan and his attorney, Wheeler K. Neff, on seventeen felony counts).[8]

b. The Consumer Financial Protection Bureau and state attorney general offices have filed civil actions against lenders using tribal lending models. *See, e.g., Consumer Fin. Prot. Bureau v. Great Plains Lending, LLC*, 846 F.3d 1049 (9th Cir. 2017) (affirming power of CFPB to investigate tribal lending arrangements), *cert. denied*, 138 S. Ct. 555 (2017); *Commonwealth of Pennsylvania v. Think Fin., Inc*., No. 14-CV-7139, 2016 WL 183289, at *1 (E.D. Pa. Jan. 14, 2016) (denying motion to dismiss state attorney general action under state RICO statute).

46. For several years, a small Montana-based Native American Tribe—the Fort Belknap Indian Community of the Fort Belknap Reservation of Montana Tribe ("the Tribe")— has been openly inviting and accepting rent-a tribe partnerships with the shadow payday loan industry, using as a vehicle for these arrangements its limited liability company, Island Mountain Development Group ("Island Mountain").

47. In 2014 testimony before Congress, the President of the Tribe stated that this company made "small-denomination, short term installment loans to consumers across the country via the Internet."[9] This testimony acknowledged that the tribal lending industry had been subject

---

[7] *See* Press Release, United States Department of Justice, Scott Tucker and Timothy Muir Convicted at Trial for $3.5 Billion Unlawful Internet Payday Lending Enterprise (Oct. 13, 2017) (https://www.justice.gov/usao-sdny/pr/scott-tucker-and-timothy-muir-convicted-trial35-billion-unlawful-internet-payday).

[8] *See* Press Release, United States Department of Justice, Two Men Found Guilty of Racketeering Conspiracy in Payday Lending Case (Nov. 27, 2017) (https://www.justice.gov/usao-edpa/pr/two-men-found-guilty-racketeering-conspiracy-paydaylending-case).

[9] Economic Development: Encouraging Investment in Indian Country, 113th Congress 48-50 (2014) (Prepared Statement of Mark Azure, President, Fort Belknap Indian Community Council).

to legal challenges and was seeking help from the Senate Committee on Indian Affairs in promoting access for this industry to payment processing networks.

48.     The Tribe has neither the financial resources, the expertise, nor the technology needed to operate a national, multi-million dollar lending enterprise.

49.     The Island Mountain website indicates that the Tribe "owns and operates three small dollar installment-based lending portfolios," including Bright Lending, and characterizes this business as an "Ecommerce Call Center." Upon information and belief, despite these portfolios being worth tens of millions of dollars, only a small portion of the profits from the Bright Lending business benefits the Tribe.

50.     For example, despite the apparent value of the tribal lending business that claims to be wholly owned and operated by the Tribe, Terrie Brockie, the CEO of Island Mountain, recently identified the Tribe's "main industry" as "agriculture, consisting of small cattle ranches, raising alfalfa hay for feed and larger dry land farms."[10]

51.     Upon information and belief, the Tribe operates its Bright Lending "lending portfolio" and "Ecommerce Business" on behalf of nontribal participants who design and direct the tribal lending scheme that charges unconscionable interest rates in violation of state usury and licensing laws.

52.     In order to engage in this extremely profitable, but illegal business, the deliberately hidden, nontribal principals have entered into agreements with the Tribe, Defendants, Bright Lending, Island Mountain, and others to make and collect on usurious loans in states across the

---

[10] Letter from Terry Brockie to the Honorable Jay Clayton, SEC Chairman, (Sept. 24, 2019), https://www.sec.gov/comments/s7-08-19/s70819-6223006-192629.pdf.

country, including in New Jersey, and to keep their identities hidden from consumers and regulators.

53.     Upon information and belief, each Defendant is aware of the numerous legal challenges to the tribal lending model and the illegality of making and collecting on usurious and void loans in other jurisdictions.

54.     With the assistance of the Tribe, Defendants establish and oversee Bright Lending to facilitate the illegal lending enterprise.

55.     Upon information and belief, Bright Lending, Island Mountain, and other businesses formed by the Tribe, operate under the oversight and management of Defendants Terry Brockie, Dustin Monroe, Tracy King, Kenneth Helgeson, Chris Gardipee, Romona Horn, and John Hawley.

56.     Defendants Terry Brockie, Dustin Monroe, Tracy King, Kenneth Helgeson, Chris Gardipee, Romona Horn, and John Hawley continue to facilitate the illegal lending scheme by allowing Bright Lending to make and collect on usurious and void loans in multiple jurisdictions, including in New Jersey.

57.     Upon information and belief, neither the Tribe nor the Defendants nor Island Mountain have applied for a consumer loan license in New Jersey or in other states with similar licensing laws.

58.     Upon information and belief, a significant portion of the lending operations done under the name Bright Lending are operated by third parties that are not located on tribal lands. These non-tribal outsiders supply all the lending capital and handle and control all or part of the marketing, underwriting, funding, risk assessment, compliance, customer complaints, accounting, lead generation, collections, and website management for the business. Upon information and

belief, nontribal outsiders exert significant control over all or a portion of these activities regardless of the location where these activities occur.

59.    Bright Lending's website includes the following disclaimer:

> Aaniiih Nakoda Finance, LLC DBA Bright Lending is an entity formed under the laws of the Fort Belknap Indian Community of the Fort Belknap Reservation of Montana (the "Tribe"), a federally-recognized and sovereign American Indian Tribe. Bright Lending is wholly-owned by the Tribe. Bright Lending is a licensed lender authorized by the Tribe's Tribal Regulatory Authority.

60.    Despite that representation, Plaintiffs are unable to locate any information regarding a Tribal Regulatory Authority or relevant regulations of the Tribe and therefore allege that this Authority and the said regulations are illusory.

61.    The Tribe has a justice system that has published the Fort Belknap Tribal Code online.[11] There does not appear to be any code section applicable to the tribal lending industry in the Fort Belknap Code. To the extent there is such a code, it is not readily available to the consumers it purports to protect.

62.    Likewise, Plaintiffs' consumer loan agreements with Bright Lending repeatedly reference a "Tribal Regulatory Authority" for its consumer complaint procedure, but the agreements provide no details for how to contact the Tribal Regulatory Authority with questions or for further information, such as a copy of the tribal regulatory code.

63.    The only information provided in the consumer loan agreement is that consumers may file a complaint "directly" with the Tribal Regulatory Authority at 2702 Montana Avenue, Suite 202 Billings, MT 59101. Plaintiffs were unable to locate any further contact information associated with the Tribal Regulatory Authority. The address that is provided for a "direct[]" filing

---

[11] Fort Belknap Code, *available at*
https://ftbelknapcourt.org/wpcontent/uploads/2021/05/fort_belknap_tribal_code-1.pdf.

of a complaint with the Tribal Regulatory Authority appears to be occupied by one of Island Mountain's businesses, rather than any neutral governmental authority.[12]

64.     The form Bright Lending consumer loan agreements prospectively waive the application of all state and federal laws, stating, *inter alia*, that "Tribal law shall exclusively apply" to all disputes.

65.     Further, the consumer loan agreement includes a mandatory "dispute resolution procedure" that is the "exclusive means of dispute resolution" available to a consumer for any claims.

66.     Notably, this dispute resolution procedure only applies to a consumer's complaint, and the lender is not restricted in the manner of enforcement of the agreement against a consumer.

67.     And even assuming that the elusive Tribal Regulatory Authority exists, the dispute resolution procedure is inherently unfair and was crafted with the purpose of insulating the non-tribal principals from liability for their illegal conduct.

68.     In addition to only applying to consumer's claims, the dispute resolution procedure requires consumers to first file complaints with Bright Lending for an investigation and response.

69.     If a consumer is unhappy with the result of Bright Lending's investigation, a consumer has the "right to file a complaint with the Tribal Regulatory Authority or the Tribal Board of Lending Disputes (if it is established in the future by the Tribe)." Thus, the consumer loan agreement indicates that the Tribe has not, but may in the future, establish one of the central (and purportedly neutral) mechanisms of the dispute resolution procedure.

---

[12] *See* Condo Units for Sale or Lease, Coldwell Banker Commercial (2018) (indicating that Suite 202 of 2702 Montana Avenue is occupied by Snake Butte Construction), https://cbcmontana.com/wp-content/uploads/2018/04/Oliver-Building-Condo-For-Sale-2018.pdf; *Our Businesses*, Island Mountain Development Group, https://www.islandmtn.com/our-businesses/ (indicating Snake Butte Construction is one of Island Mountain's businesses).

70.     Finally, a borrower can file a final appeal with the Tribal Council—the same government body that is responsible for establishing and overseeing Island Mountain and Bright Lending.

71.     At no point during the process, does the consumer have the right to present evidence or request any kind of hearing. There is no judicial oversight, and it is unclear how a consumer would enforce an award if successful. Presumably, it is assumed that a consumer would never win or would never bother to pursue such a complaint.

72.     Additionally, each of Defendants is aware that numerous consumers have complained regarding abusive lending practices used by the lending business. For example, the Washington State Department of Financial Institutions has issued alerts about unlicensed lending conducted by the Fort Belknap Indian Community, including Bright Lending.[13]

73.     Similarly, in June 2020, the Better Business Bureau "recognized a pattern of complaints from consumers regarding lending practices of Bright Lending." Business Profile: Bright Lending, BBB, https://www.bbb.org/us/mt/hays/profile/loans/bright-lending-1296-1000041943 (last visited Nov. 19, 2021). In this pattern of complaints, "[c]onsumers allege they borrow money but after making several payments, they discover they owe much more money than they borrowed." *Id.*

74.      Bright Lending responded to the Better Business Bureau that, *inter alia*, it was committed to complying with only the "*spirit* of all applicable federal laws and the laws," *Id.* (emphasis added).

---

[13] *Fort Belknap Indian Community Not Licensed in Washington*, Wash. DFI (Dec. 14, 2018), https://dfi.wa.gov/consumer/alerts/fort-belknap-indian-community-not-licensed-washington.

## <u>CLASS ACTION ALLEGATIONS UNDER RULE 23</u>

75.     Plaintiffs bring this action on behalf of themselves and all others similarly situated

pursuant to Federal Rules of Civil Procedure Rule 23(a) and 23(b)(l), (b)(2), and (b)(3), as

representatives of the following Class:

> All persons who obtained Bright Lending loans from the beginning of the period
> commencing four years prior to the filing of this action, who, at the time the loan was made,
> were residents of any states other than Nevada or Utah, or of the District of Columbia.

76.     The identity and of the members of the Class will be easily ascertainable from the

records of Defendants.

77.     Plaintiffs also are asserting claims on behalf of the following subclasses of the

Class:

> a.   First, the subclass of those who made payments on such loans in an amount in excess
>      of the amount of loan proceeds they received ("the RICO Subclass"); and

> b.   Second, the subclass of those who were living in New Jersey at the time they entered
>      into Bright Lending loan agreements ("the New Jersey Subclass").

78.     **<u>Numerosity</u>. Fed. R. Civ. P 23(a)(1).** At this time, Plaintiffs do not know the exact

number of members of the Class. However, based on the class sizes in similar cases, Plaintiffs

anticipate that there are likely thousands of members. Thus, the class is so numerous that joinder

of all members is impracticable.

79.     **<u>Typicality</u>. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of

each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of

action as the other members of the putative Class and Subclass. All are based on the same facts

and legal theories.

80.     **<u>Adequacy of Representation</u>. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate

representatives of the Class because their interests coincide with, and are not antagonistic to, the

interests of the members of the Class; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them not to vigorously pursue this action.

81.     **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2) and 23(b)(3).** Common questions of law and fact exist as to all members of the Class, and there are no factual or legal issues that differ between the putative class members. These questions will predominate over the questions affecting only individual class members. The common questions include: (1) whether the form loan agreements contain invalid and unenforceable choice-of-law and mandatory dispute resolution provisions; (2) the identity of the John Doe Defendants who are operating the "tribal" lending sham; (3) the facts surrounding the organization, structure and funding of the underlying enterprise, including with regard to control over the business and the performance of the various lender functions, as well as the flow of lending capital and revenue; (4) the extend of Defendants' knowledge and participation in the affairs of the enterprise; (5) whether the loans are "unlawful debt" for purposes of RICO; (6) whether Defendants violated RICO by collecting on the loans; and (7) what is the proper recovery for Plaintiffs and the class members against Defendants.

82.     **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively

20

redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system because of the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

83.     **Declaratory Relief**. **Fed. R. Civ. P. 23(b)(2).** Defendants have acted or refused to act on grounds that apply generally to the class, rendering declaratory relief appropriate respecting the class as a whole.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Violation of RICO, 18 U.S.C. § 1962(c)**
**(CLASS CLAIM AGAINST ALL DEFENDANTS**
**IN THEIR INDIVIDUAL CAPACITIES ONLY)**

84.     Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding paragraphs.

85.     Defendants are each a "person" as that term is defined in 18 U.S.C. § 1964(3) and are being sued in their individual capacities with regard to their own individual conduct.

86.     Defendants, along with the Tribe, the Tribal Council, Island Mountain, and others were and continue to be members and associates of an internet lending association-in-fact that will be referred to hereafter as the "Usurious Lending Organization" or "the Enterprise."

87.     The Usurious Lending Organization, including its leadership, membership, and associates, constitutes an "enterprise" as that term is defined in 18 U.S.C. § 1961(4)—that is, a group of individuals and entities associated in fact.

88.     The members and associates of the Usurious Lending Organization share various common purposes, including the evasion of state usury and licensing law, the operation of the "Bright Lending" website, the processing of applications from consumers across the United States the collection of payments from borrowers, and the division of generated revenues in accordance with written agreements.

89.     The Usurious Lending Organization assigned specific roles to the members and associates. The John Doe Defendants designed and directed the Organization and distributed the revenues generated in accordance with the said written agreements. The role of the named Defendants was primarily to establish and organize the tribal façade for the Organization and to take various measures designed to reinforce the fiction that the Organization is a tribal-run business.

90.     The Usurious Lending Organization has had a longevity sufficient to originate and collect tens of thousands of illicit loans.

91.     The Usurious Lending Organization has been engaged in, and its activities affected, interstate commerce. The named Defendants perform their roles from the tribal lands in Montana but the John Doe non-tribal Defendants who are operating the Organization do so, upon information and belief, from locations in other states. The Organization sends loan proceeds into and collects payments from, locations throughout the United States.

92.     RICO defines "unlawful debt" as a debt which was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

93.     Defendants violated § 1962(c) of RICO, 18 U.S.C. § 1962(c), by participating, directly or indirectly, in the conduct of the Enterprise's affairs in the collection of unlawful debt.

94.     All of the loans made to Class members and collected by Defendants and Defendants co-conspirators included interest rates far in excess of twice the enforceable rate in their states.

95.     As alleged, each of Defendants participated in the collection of unlawful debt.

96.     Plaintiffs and the RICO Subclass members were injured as a direct result of Defendants' violations of 18 U.S.C. § 1962(c) by, among other things, the payment of unlawful debt to the Enterprise, which money transfers would not have been made but for Defendants' conduct.

97.     Accordingly, Defendants are jointly and severally liable in their individual capacities to Plaintiffs and the RICO Subclass for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## SECOND CAUSE OF ACTION
### Violation of RICO, 18 U.S.C. § 1962(d)
### (CLASS CLAIM AGAINST ALL DEFENDANTS)

98.     Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding paragraphs.

99.     Defendants violated § 1962(d) of RICO, 18 U.S.C. § 1962(d), by conspiring to violate § 1962(c).

100.    Defendants each knowingly agreed to participate in the scheme alleged herein that allowed the Enterprise to make and collect unlawful debt at more than twice the lawful rate of interest under state usury laws.

101.    Plaintiffs and the RICO Subclass members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(d) and are entitled to treble their actual damages, which would include any interest, fees, or other sums collected by the enterprise.

102.    Defendants are jointly and severally liable in their individual capacities to Plaintiffs and the RICO Class for actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**THIRD CAUSE OF ACTION**
**DECLARATORY JUDGMENT**
**(CLASS CLAIM AGAINST DEFENDANT BRIGHT LENDING**)

103.    Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding paragraphs.

104.    New Jersey and other states with similar laws require a license for the conduct engaged in by Bright Lending in New Jersey and other states.

105.    None of the Tribe's businesses nor its subsidiaries or servicers were licensed to make loans in New Jersey or any other state in the United States.

106.    Because the loans were made without the required license and charged excessive interest rates, the loans are null and void.

107.    Additionally, as alleged herein, the loan agreements were violative of fundamental state public policy in New Jersey and other states with similar usury, licensing, and criminal laws.

108.    Plaintiffs and members of the Class are subject to ongoing harm absent a declaration that the loans were void, including adverse credit reporting of the invalid loans.

109.    Additionally, Plaintiffs and members of the class are subject to a sham dispute resolution system that was designed to protect wrongdoers from liability for their conduct.

110.    Pursuant to 28 U.S.C. § 2201, there is an actual justiciable controversy, and a declaratory judgment is the appropriate mechanism for resolving the validity and enforceability of the loan agreements, as well as the validity, if any, of the choice of law and forum-selection provisions.

111.     Accordingly, Plaintiffs seek a declaratory judgment that the loan agreements are invalid, the loans were never collectable, and the dispute resolution procedure is unenforceable.

## FOURTH CAUSE OF ACTION
### VIOLATIONS OF NEW JERSEY'S CONSUMER FINANCE LICENSING ACT
### (NEW JERSEY SUBCLASS CLAIM AGAINST BRIGHT LENDING)

112.     Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding paragraphs.

113.     As alleged herein, Plaintiffs' loans were void *ab initio* because they violated New Jersey's licensing and usury requirements in addition to violating New Jersey's public policy and using unconscionable terms. Plaintiffs were thus never obligated to pay any amount on the invalid loans. *See* N.J. Stat. § 17:11C-33 (providing that loans made without a license or in violation of the licensing statute's interest rate cap "shall be void and the lender shall have no right to collect or receive any principal, interest or charges").

114.     Plaintiffs seek for themselves and for the New Jersey Subclass "three times any amount of the interest, costs or other charges collected in excess of that authorized by law" from Bright Lending for its knowing and willful violations of the New Jersey Consumer Finance Licensing Act. N.J. Stat. § 17:11C-33.

## FIFTH CAUSE OF ACTION
### VIOLATIONS OF NEW JERSEY'S USURY LAWS
### (NEW JERSEY SUBCLASS CLAIM AGAINST BRIGHT LENDING)

115.     Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding paragraphs.

116.     Plaintiffs received loans that charged interest rates in excess of 16%. N.J. Stat. § 31:1-1(a).

117.     Bright Lending collected excessive interest from Plaintiffs' and the class members' bank accounts using triple-digit interest rates.

118.    Bright Lending's violations of New Jersey's usury laws was knowing and willful. This is evidenced in part by the astronomical interest rates that were knowingly charged to New Jersey residents with New Jersey home addresses and New Jersey bank accounts.

119.    Bright Lending received amounts collected from consumers.

120.    As a result, Plaintiffs and the members of the New Jersey Subclass are entitled to recover the total amount of any payment made in excess of the principal amount of the loan, plus the costs of bringing this action.

## SIXTH CAUSE OF ACTION
### NEW JERSEY CONSUMER FRAUD ACT
### (NEW JERSEY SUBCLASS CLAIM AGAINST ALL DEFENDANTS)

121.    Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding paragraphs.

122.    Defendants' conduct caused an ascertainable loss to Plaintiffs and the members of the class by, *inter alia*, inducing Plaintiffs to make payments on void loans, inducing Plaintiffs to pay excessive interest rates, and tricking Plaintiffs into believing that they had no legal recourse for Defendants' conduct.

123.    The amount that each Plaintiff and class member paid is easily ascertainable through the business records maintained by Bright Lending.

124.    Defendants engaged in numerous false and deceptive practices, including, but not limited to, allowing nontribal outsiders to use the Tribe as a front for the illegal lending scheme; falsely claiming that the loans are solely governed by Tribal law despite the existence of numerous court decisions establishing the invalidity of such claims; creating and using a sham dispute resolution system; and claiming that Bright Lending is licensed by a separate and neutral "Tribal Regulatory Authority" that does not exist.

26

125.    Plaintiffs and members of the New Jersey Subclass are entitled to recover from Defendants their actual damages and equitable relief, along with an "award of threefold the damages sustained," as well as "reasonable attorneys' fees, filing fees and reasonable costs of suit." N.J. Stat. § 56:8-19.

### SEVENTH CAUSE OF ACTION
### COMMON LAW CIVIL CONSPIRACY CLAIM
### (NEW JERSEY SUBCLASS CLAIM AGAINST ALL DEFENDANTS)

126.    Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding paragraphs.

127.    As alleged Plaintiffs received and made payments on loans from Bright Lending that charged exorbitant interest rates.

128.    Bright Lending violated New Jersey's usury laws, Consumer Finance Licensing Act, and Consumer Fraud Act with impunity.

129.    Bright Lending's conduct harmed Plaintiffs and the class members.

130.    As alleged, Defendants Terry Brockie, Dustin Monroe, Tracy King, Kenneth Helgeson, Chris Gardipee, Romona Horn, John Hawley, and others not yet known to Plaintiffs each agreed to the collection of unlawful debt through Bright Lending. Upon information and belief, discovery will demonstrate that through their supervisory roles over the Tribe's businesses, by signing servicing agreements, and by negotiating such agreements, each of these Defendants agreed to the illegal and harmful conduct, including the triple digit interest rates to be charged to New Jersey consumers.

131.    As a result, Plaintiffs seek damages, for themselves and the New Jersey Subclass against Defendants Terry Brockie, Dustin Monroe, Tracy King, Kenneth Helgeson, Chris Gardipee, Romona Horn, John Hawley, and others not yet known to Plaintiffs for the injuries they

sustained as a result of the conspiracy to violate New Jersey's usury laws, Consumer Finance Licensing Act, and Consumer Fraud Act.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment against Defendants as follows:

A.      An Order certifying the proposed Classes under Fed. R. Civ. P. 23(b)(2), and (b)(3) and appointing Plaintiffs as class representatives and their counsel as class counsel, as soon as practicable;

B.      An Order declaring that the loan agreements are void and unenforceable;

C.      An Order awarding monetary damages against Defendants in their individual capacities, including but not limited to any compensatory, incidental, or consequential damages in an amount to be determined by the Court or jury;

D.      An Order awarding statutory damages against Defendants in their individual capacities in accordance with proof and in an amount consistent with applicable precedent;

E.      An Order awarding interest at the maximum allowable legal rate against Defendants, in their individual capacities on the foregoing sums;

F.      An Order awarding Plaintiffs their reasonable costs and expenses of suit, including attorneys' fees against Defendants, in their individual capacities; and

G.      Such further relief as this Court may deem just and proper.

**TRIAL BY JURY IS DEMANDED**

Respectfully submitted,

*/s/ John J. Grogan*
John J. Grogan

28

NJ I.D. No. 026971993
LANGER, GROGAN & DIVER
1717 Arch St., Ste 4020
Philadelphia, PA 19103
Tel: (215) 320-5660
Fax: (215) 320-5703
jgrogan@langergrogan.com

**CERTIFICATION PURSUANT TO L. CIV. R. 11.2**

Pursuant to Local Civil Rule 11.2, I hereby certify that the matter in controversy is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding.

_/s/ John J. Grogan_____
John J. Grogan
NJ I.D. No. 026971993
LANGER, GROGAN & DIVER
1717 Arch St., Ste 4020
Philadelphia, PA 19103
Tel: (215) 320-5660
Fax: (215) 320-5703
jgrogan@langergrogan.com

**CERTIFICATION PURSUANT TO L. CIV. R. 201.1(d)**

Pursuant to Local Civil Rule 201.1, I hereby certify the above-captioned matter is not subject to compulsory arbitration in that, inter alia, the amount in controversy exceeds the $150,000 threshold exclusive of interest and costs and any claim for punitive damages.

_/s/ John J. Grogan_____
John J. Grogan
NJ I.D. No. 026971993
LANGER, GROGAN & DIVER
1717 Arch St., Ste 4020
Philadelphia, PA 19103
Tel: (215) 320-5660
Fax: (215) 320-5703
jgrogan@langergrogan.com